272 F.2d 533
 106 U.S.App.D.C. 304, 32 P.U.R.3d 435
 BENDIX AVIATION CORPORATION, BENDIX RADIO DIVISION, Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee, Aeronautical
Radio, Inc., and Air Transport Association of
America, Intervenors.
AERONAUTICAL RADIO, INC., a corporation, et al., Petitioners,
v.
UNITED STATES of America, Federal Communications Commission,
Respondents.
 Nos. 14650, 14693.
 United States Court of Appeals District of Columbia Circuit.
 Argued May 25, 1959.
Decided Nov. 13, 1959.
 
 Mr. Daryal A. Myse, Washington, D.C., for appellant in No. 14650.
 Mr. Joseph DuCoeur, Washington, D.C., with whom Messrs. Donald C. Beelar and John E. Stephen, Washington, D.C., were on the brief, for petitioners in No. 14693.
 Mr. Max D. Paglin, Asst. General Counsel, Federal Communications Commission, with whom Mr. John L. Fitzgerald, General Counsel, Federal Communications Commission, and Mrs. Ruth V. Reel, Counsel, Federal Communications Commission, were on the brief, for appellee in No. 14650 and respondent Federal Communications Commission in No. 14693. Mr. John Conlin, Counsel, Federal Communications Commission, also entered an appearance for appellee in No. 14650 and respondent Federal Communications Commission in No. 14693. Mr. Richard A. Solomon, Attorney, Department of Justice, with whom Mr. Henry Geller, Attorney, Department of Justice, was on the brief, for respondent, United States of America, in No. 14693. Mr. Daniel M. Friedman, Attorney, Department of Justice, also entered an appearance for respondent, United States of America, in No. 14693.
 Mr. Donald C. Beelar, Washington, D.C., with whom Messrs. Joseph DuCoeur and John E. Stephen, Washington, D.C., were on the brief, for intervenors in No. 14650.
 Before WASHINGTON, DANAHER and BURGER, Circuit Judges.
 DANAHER, Circuit Judge.
 
 
 1
 The Commission on April 16, 1958, adopted without prior notice, and on April 18, 1958, released, its Memorandum Opinion and Order[1] effecting immediate changes in its Rules. Many bands of frequencies were reassigned, some to be reserved exclusively for Government use, some exclusively for non-Government use and others on a shared basis. We are here concerned with two such bands, one involving frequencies in the 420-450 Mc band, and the other touching frequencies in the 8500-9000 Mc band. We will discuss only so much of the problem presented and the questions involved as we deem basic and essential to our conclusions.
 
 
 2
 Bendix Aviation Corporation (herein Bendix) on May 9, 1958, sought authorization for experimental use of the 430 Mc frequency in two of its aircraft for the development of an airborne aircraft collision avoidance system. Its petition was dismissed and reconsideration was denied. Bendix appealed[2] and here challenges the Commission's action in case No. 14650.
 
 
 3
 Air Transport Association of America and Aeronautical Radio, Inc. (herein ARINC/ATA) filed a pleading in support of the Bendix application. These parties, Bendix and others before the Commission had sought reconsideration of the Commission's April 16, 1958 Order, but all reconsideration was denied by the Commission's Order released July 31, 1958.[3] In case No. 14693 ARINC and ATA insist that the Commission's termination of the 8500-9000 Mc band for use in radionavigation with its consequent availability to exclusive use by the Government for 'radiopositioning'[4] is invalid. By our order of October 16, 1958, these cases were consolidated.
 
 
 4
 The restrictions in the use of the spectrum were initiated by a request from the Office of Defense Mobilization (ODM)[5] acting, as the Commission said, in behalf of the Executive Branch of the Government. The representations submitted by ODM bore a security classification and the material has not been made public pursuant to Executive Order 10501[6] and Section 4(j) of the Communications Act[7] which in pertinent part reads: 'The Commission is authorized to withhold publication of records or proceedings containing secret information affecting the national defense.'
 
 
 5
 The Commission based its action on representations by ODM that the 'reallocation of frequency bands for Government use are stated to be essential to fill radio-positioning requirements which have increased significantly in recent years due to the international political climate and the advent of the 'space age"; 'that the requirements in question cannot be accommodated in frequency bands presently allocated for Government use'; and that redesignation of bands for rxclusive use by Government services must be made 'at this time.' Accordingly, because of the urgency and nature of the Government's requirements and 'because of the vital national defense considerations involved,' the Commission made its public interest determination that its Rules be amended immediately to permit the orderly satisfaction of national defense requirements. The Commission further found that in view of such necessities and the vital national defense factors which it concluded were here compellingly involved, it was impracticable and contrary to the public interest to comply with the public notice requirements of Section 4 of the Administrative Procedure Act.[8]
 
 
 6
 Appellant and petitioners alike have attacked the Commission's failure to comply with the public notice provisions of the section.
 
 
 7
 No. 14650.
 
 
 8
 Some three weeks after the Commission had ordered the denial of non-Government access to the 420-450 Mc band, Bendix applied for experimental use of the 430 Mc frequency to develop a device for the prevention of mid-air collisions between aircraft. That such airborne electronic equipment is highly necessary may be assumed, especially where so many competent authorities, Government representatives and industry spokesmen alike, seem to have united in their efforts to devise a system to reduce the collision hazards which are a matter of common knowledge. The Commission also was clearly cognizant of the public interest character of the Bendix objective. In issue is the determination by the Commission that the Government need is paramount and vitally transcends non-Government use of the frequencies here involved, even assuming the very substantial public interest in and need for an airborne collision avoidance system. That determination is challenged on several grounds.
 
 
 9
 Bendix claims that under 47 U.S.C.A. 309 it was entitled either to a grant or to a hearing. But when the Bendix application was filed, the frequency of 430 Mc had already been withdrawn from the field of non-Government use except as the Commission authorized temporary use of the frequency until February 15, 1963, for radio altimeters[9] and for amateur service. Even amateur use was to be permitted on a limited power basis and then only on condition that it not cause harmful interference to the radiopositioning service[10] as defined in the amended Rules.[11] Thus Government use for radiopositioning was already exclusive with the exceptions noted, when Bendix filed its May 9, 1958, application. Contrary to the argument of Bendix, we conclude the Commission's action was not in derogation of the Act or of the Commission's Rules touching experimental authorizations, for frequency 430 Mc simply was no longer available for any such purpose as was disclosed by the Bendix application.
 
 
 10
 But, Bendix argues, to permit an allocation of the requested frequency for substantially exclusive Government use for radiopositioning is in conflict with treaty obligations of the United States. Prior to the April 16, 1958 Order, the 1947 Atlantic City Convention[12] had provided for international use of the band 420-450 Mc for aeronautical radionavigation and amateur services, with two footnotes appended. Atlanctic City Footnote 210, subject to the limitation in Footnote 211, accorded priority in this band to aeronautical radionavigation with the requirement that other services admitted to the band not cause harmful interference to the priority service. Atlantic City Footnote 211 provided for Region 2 (which includes the United States), that the allocation for aeronautical radionavigation is temporary and exclusively for altimeters.
 
 
 11
 Conformably thereto, the Commission's Rule, 47 C.F.R. 2.104(a)(5) adopted and applied the treaty provisions, with added footnotes US 11, in effect, permitting aeronautical radionavigation service, i.e., altimeters, to use the band 420-460 Mc only until February 15, 1963, and US 18 limiting the power to be utilized by the amateur service. That same rule, as amended agreeably to the April 16, 1958 Order simply spelled out that 'radio altimeters' were not to be permitted to use the band 420-460 after February 15, 1963, and that amateur service was not to cause harmful interference to the radiopositioning service. Such requirements and limitations not only conformed to the Radio Regulations annexed to the Atlantic City Convention but to the applicable provisions of the Buenos Aires Convention of 1952, (T.I.A.S. No. 3266). Except for such limited use and services, the amended rule by US 104 thereafter precluded non-Government service.
 
 
 12
 The Bendix argument on the treaty aspect must fall. The Commission's Order did not allocate the 430 Mc frequency to radiopositioning. Subject to the exceptions noted, to repeat, it denied non-Government access to the 420-450 Mc band. Whatever assignment of the permitted Government use was to be made depends upon action by the President. If the withdrawn band is to be assigned to radiopositioning, that decision is his responsibility, devolving upon him not only as Chief Executive, but expressly by virtue of Section 305.[13] Thus, Government radio stations so operating pursuant to such assignment, do not come within Section 301 and 303 of the Act and are not subject to Commission jurisdiction.
 
 
 13
 Moreover the Commission's amended Rule did not exclude amateur access to the band, and expressly provided that nationally, the treaty-permitted acronautical radio-navigation service is to be temporary and exclusively for altimeters. We need not stop to explore the full import of Article 22[14] of the International Telecommunication Convention, Buenos Aires, 1952, the preamble of which fully recognized 'the sovereign right of each country to regulate its telecommunication.' Article 48 thereof provided that 'Members and Associate Members retain their entire freedom with regard to military radio installations of their army, naval and air forces.' Bendix can take nothing from the treaty which represents the agreement of our Government. Action, if and when taken pursuant to the Convention in behalf of our Government, must be by the President as Chief Executive,[15] and we fail to see how in any respect his action here is contrary to our international obligations. Our review authority extends only to decisions and orders of the Commission.[16] One of the prime purposes of the Act is for 'national defense,'[17] and as to all channels of communication not pre-empted by the Government, licenses are required.[18] Government stations, as we have noted, are specifically exempted by Section 305. Channels of communication subject to Government control, use and assignment clearly are not available to the public. The United States is a party here and has appeared through its attorneys in support of the position of the Government as it had sought to meet the requirements of national defense. We must presume the Director of the Office of Defense Mobilization acted for the President as did the Secretary of War in Wilcox v. Jackson[19] with respect to a military need. Similarly, reservation of waters for a public purpose was upheld even against the claim of a state, in Winters v. United States.[20] We conclude that the Commission pursuant to the exercise of the prerogative of the Executive correctly conformed its Rules to accommodate the national defense requirements as the Convention permitted.
 
 
 14
 Bendix says, though challenged, that its experimental device possesses transmitting characteristics precisely similar to those of an altimeter, and accordingly the Commission's action in denying a hearing was arbitrary. Again our appellant overlooks the effect of the Commission's Order. The Commission found that the Government need is paramount. It simply ruled in effect, that even if the Bendix device be an altimeter, there is to be no further permitted use of a frequency which the Government through the President acting in his Constitutional capacity and pursuant to Section 305, has assigned to meet a vital national defense need for radiopositioning.
 
 
 15
 Upon reconsideration sought by all parties, the Commission noted that its April 16, 1958 Order in no way adversely affected the later Bendix application for even under the Commission's Rules prior to the Order, the intended use could not have been licensed consistently with the international table. We need not so decide as we construe the predicate for the action. Taking special note of the Bendix claims in this particular, the Commission reiterated in its July 30, 1958 Order the position it had originally adopted thus:
 
 
 16
 'The ODCM has determined that the band 420-450 Mc is the only one which can feasibly be made to serve the Government radiopositioning requirement that must be fulfilled in this portion of the spectrum. Therefore the national defense consideration being paramount, the Commission adheres to the position taken in the April 16 Order with respect to the band.'
 
 
 17
 It remains, then, for us to examine the authority for the Commission's initial action. As here pertinent, we turn to Executive Order 10460, June 16, 1953, 47 U.S.C.A. 151 note, reproduced in the margin,[21] which provides for the 'Performance by the Director of Defense Mobilization of Certain Functions Relating to Telecommunications.'
 
 
 18
 We have fully appreciated the importance of the issue. We do not question that Bendix is competent and qualified. We recognize the depth of the conflict between the demands of the Executive on the one hand and of private but important non-Government entities on the other. Various possibilities of abuse can be conjured were we to speculate, but we cannot assume and there is no slightest suggestion of record, that there has been a 'perversion of the Commission's administrative processes for an improper purpose.'[22] On the contrary, the action complained of reflects compliance with the position of the Executive taken in the national interest. A reading of the terms of Executive Order 10460 demonstrates its harmonious accommodation to emergencies which Congress in writing the Communications Act must have foreseen. Thus tested the Commission's action, pursuant to Sections 1, 4(i), (j), and 303(c), (f), (g) and (r) of the Act, was authorized.
 
 
 19
 National trust and responsibility must be reposed somewhere and in this situation, by Section 305 of the Communications Act and otherwise, they are centered in the President with all his vast power.[23] He is the Commander in Chief.[24] That the national emergency declared in Proclamation No. 2914[25] has occasioned continued and still present concern is public knowledge.
 
 
 20
 Bendix, substantially on the grounds treated, has attacked the Commission's denial of its requested experimental license authority,[26] despite the fact that the frequency it sought was no longer available for non-Government use.[27] We are satisfied that the challenged action of the Commission must be sustained and accordingly, the dismissal of the Bendix applications and the denial of reconsideration were proper.
 
 
 21
 No. 14650 Affirmed.
 
 No. 14693
 
 22
 The petitioners here seek review of the Commission's Order[28] released July 31, 1958 denying reconsideration of the April 16, 1958 Order with the consequent amendment of the Commission's Rules pertaining to the 8500-9000 Mc band.[29] The petitioners argue invalidity on substantially the grounds we have already discussed. Yet some different treatment is indicated as will be noted.
 
 
 23
 Actually, the conflict centers around the frequency 8800 Mc, as included within the 8500-9000 Mc bank which had been made available according to the Atlantic City Convention for 'worldwide' use in radionavigation.[30] Conformably thereto, the Commission's Rules prior to the April 16, 1958 Order had provided nationally for the radionavigation service with shared use between Government and non-Government.
 
 
 24
 Pursuant to the April Order the Rules as amended, but applicable to the United States only, provided that the band 8500-9000 Mc was allocated to exclusively Government use for radiopositioning, subject to temporary Government and nonGovernment sharing accordance with US Footnote 120 which reads:
 
 
 25
 'In the band 8750-8850 Mc, Government and non-Government airborne doppler radars in the aeronautical radionavigation service may be authorized temporarily until moved to a frequency band allocated to the aeronautical radionavigation service, and meanwhile must accept any harmful interference that may be experienced from the radiopositioning service.'
 
 
 26
 The pleadings show that for several years much developmental effort had been undertaken in the doppler navigation field, indeed, prior to the April Order many licenses had already been issued by the Commission authorizing use of the 8800 Mc frequency by doppler radar equipment.[31] Among the petitioners operating in air transportation over domestic and international routes are Pan American World Airways, Inc., Trans World Airlines, Inc. and United Airlines, Inc., which either had already installed under license, or were committed to the installation of, airborne doppler equipment to operate in their aircraft on the 8800 Mc frequency. Petitioner, Bendix Aviation Corporation, was engaged in the development and manufacture of such equipment. Petitioner, Aeronautical Radio, Inc., ARINC, is an aeronautical communications agency for air carriers and others, and petitioner, Air Transport Association of America, ATA, is an association of air carriers. Both of the latter petitioners provide information, guidance and coordination on radio frequency engineering and otherwise render service with respect to the technical characteristics of aeronautical radionavigation devices for use in air transportation. These petitioners have vigorously contested the future down-grading of the 8800 Mc frequency from its treaty-permitted primary status which would continue to be available to foreign flag carriers, but not to petitioners except upon a temporary basis pending removal to another band. Meanwhile, because of US Footnote 120, domestic non-Government users must accept such harmful interference as may be occasioned by Government use of the frequency for radiopositioning. It is clear that their concern has not been alleviated by the Commission's further amendment of its Rules so as to permit the licensing of dopplers on the 13000 Mc frequency.
 
 
 27
 The Commission in its July 31, 1958 Order took account of the problem of the petitioners even as it sought to meet the national defense requirement for an exclusive allocation for radiopositioning subject to US Footnote 120 so far as the band 8750-8850 Mc was affected. The Commission said:
 
 
 28
 'The Commission anticipates that the regular licensing of dopplers at 8800 Mc will continue until the Commission finds the state of the art permits the transition to the 13000 Mc band and until such time as the Commission finds equipment can be made available in that band. At such time as the present licensing policy under US120 is modified, the Commission will, to the greatest extent possible, endeavor to provide a reasonable amortization period. This policy will be followed because, at the time of the April 16 Order, the Commission had already licensed airborne dopplers at 8800 Mc in accordance with the provisions of its Rules and there was no licensing availability in the Rules for 13000 Mc doppler equipment. The Commission has today modified its Rules so as to permit the licensing of 13000 Mc dopplers. The Commission expects the aviation industry will make diligent efforts to exploit the 13000 Mc allocation for airborne doppler equipments.'
 
 
 29
 We are satisfied that the Commission, confronted by the demands of the Executive for exclusive use of the frequency in question, had thus undertaken to do whatever was reasonably open to it in the light of national defense needs. Our earlier discussion demonstrated our conviction that the Commission possesses the authority to modify its Rules to accommodate the requirements of the Government itself. The field in which Government need for radiopositioning was deemed paramount involved interdepartmental expertise and the exercise by the President through OCDM of decisional prerogatives which had not been entrusted to the Commission by the Act.
 
 
 30
 When petitioners and their constituents prior to the April 16, 1958 Order had expended developmental effort with respect to the 8800 Mc frequency, they assuredly knew that their operations contemplated the use of a Government and non-Government shared band. We perceive no basis for an assumption on their part that they were to be protected against interference by Government operations[32] or even against interference from each other. The Commission did not terminate domestic access by radionavigation services to the center frequency of 8800 Mcs. The Commission's amended Rule in no way whatever impinged upon our Government's treaty obligations to foreign signatories utilizing that frequency for radionavigation, as permitted by the Atlantic City Convention. Footnote US 120 specifically looked to continued sharing of the band, subject only to the requirement that users accept any harmful interference that may be experienced from the radiopositioning service. Petitioners' arguments based upon treaty commitments must fall.
 
 
 31
 Petitioners would say that the Commission's action was arbitrary and capricious. Granted the necessity for meeting essential national defense requirements, we fail to see how the Commission had any other alternative. The Executive had demanded that all potential users of the frequency in question be put upon immediate notice that at some future date the 8800 Mc frequency was to be exclusively Government. Meanwhile, the Commission made available to the aeronautical radionavigation service the 13000 Mc frequency. These very petitioners as is disclosed in the testimony of their undoubtedly qualified witnesses in docket No. 11866 had recognized the availability of a 13000 Mc frequency and had given it their support.
 
 
 32
 Our files contain a stipulation of the parties that the record certified by the Commission to us be supplemented with additional material. Counsel for the petitioners did not concede that information on file with the Commission in docket Nos. 11866 and 11997 was here relevant to the Commission actions, but we believe it was. Such investigations by the Commission are clearly authorized by the Act.[33]
 
 
 33
 We have studied all of the record as so supplemented. As early as November 9, 1956, the Commission had released its preliminary notice of hearing in docket No. 11866, issue 13 of which read: 'What are the requirements for the radio navigation service for spectrum space above 890 Mc?' An order of inquiry in docket No. 11997 had been released April 11, 1957.
 
 
 34
 ARINC in its statement of proposed evidence for docket No. 11997, in addition to expressing its intention to present as witnesses representatives of ATA, also specified the inclusion of ARINC testimony in docket No. 11866. That the witnesses were looking to the future as well as reviewing the past history of development of air carrier transportation, was dramatically emphasized:
 
 
 35
 'To illustrate, a DC-4 flying 8 hours a day will generate approximately 85,512 available seat miles. A DC-8, flying the same number of hours per day, will generate 467,000 available seat miles per day, a ratio of nearly 5 1/2 DC-4's to each one DC-8. * * * Two such aircraft will give the available lift in passengers now * * * equal to the Queen Mary. I think that is a good comparison. It is a little staggering when you think of that, but it is all in the matter of speed.'
 
 
 36
 That flight equipment must be inextricably bound up with the expansion of commercial air travel over the next seven or eight years was demonstrated to the Commission. That development of aeronautical radionavigation equipment to its utmost efficiency went hand in hand with such expansion was conclusively established, the Commission might well have found. That airborne doppler navigation aids are importantly linked with jet air speeds in such an enhanced volume of air traffic, the Commission could not have failed to notice.
 
 
 37
 The secret word underlying the conflict between the petitioners and the Government is 'interference.' Aircraft in vast numbers flying at a speed of hundreds of miles per hour attempting to utilize constricted flight areas present a problem, not merely of airlanes and airports but of telecommunication and electronic safety equipment, the Commission could readily have seen. The problem in part has been faced by Congress in the Federal Aviation Act of 1958.[34] H.R.Rep. No. 2360 tells us:
 
 
 38
 'The magnitude and critical nature of the problem came first to general public notice, perhaps, as a result of the midair collision of two airliners over Grand Canyon on June 30, 1956, when 128 lives were lost. Following this disaster were fatal air crashes between civil and military aircraft operating under separate flight rules established in the Civil Air Regulations.'[35]
 
 
 39
 Another phase of the common problem is that presented by the record here which discloses that the petitioners have sought an interference-free frequency upon which to operate the radio-navigation equipment to which they are committed. In the light of the claims of the petitioners the Commission noted:
 
 
 40
 'The ODCM has advised the Commission that the relief requested by petitioners again cannot be reconciled with the national defense requirements in this area of the spectrum. The loss of any significant portion of spectrum space in the 8500-10000 Mc region would make the radiopositioning service inoperative at major defense installations. Further, under the circumstances, it is the judgment of the Commission that it would not be in the public interest for two vital services, radiopositioning, and aeronautical radionavigation, one involving the security of the nation and the other the safety of life, to utilize the same frequency band on a permanent basis. Because we deem the Government's requirements in this portion of the spectrum to be paramount we must adhere to our previously announced decision with respect to these frequencies.'
 
 The Commission further observed:
 
 41
 'However, should we eventually
 
 
 42
 'However, should we eventually learn that it is unlikely that interference will occur, the aviation industry should not then be reluctant to accept this condition (US 120 supra). * * *
 
 
 43
 'If, on the other hand, we eventually learn that interference is likely to occur, the interference condition provision in US120 becomes most pertinent, and the reason for retaining it is self-evident.'
 
 
 44
 We are persuaded that the position of the Commission is eminently reasonable and in no respect arbitrary and capricious, as petitioners would have us say.
 
 
 45
 The petitioners have complained of their being denied access to the material furnished by OCDM to the Commission upon the basis of which the national defense requirements were placed before the Commission. They moved to supplement the record before us that such material might be reviewed by this court. We ordered that the material be transmitted to us but that it be impounded under seal subject to examination by us should we decide that examination is required. A claim of privilege was lodged with us by the Director of the Office of Civil and Defense Mobilization in the Executive Office of the President. A pertinent paragraph from his sworn 'claim' reads:
 
 
 46
 'I have actually and personally examined and considered exact mimeographed copies of the documents which are the subject of the motion, the originals being in the custody of the Federal Communications Commission, and I find that the documents sought could not be furnished without seriously jeopardizing the capability of the military services to defend the nation because they would reveal information upon which a potential enemy could readily develop effective countermeasures to this country's defense, would disclose highly secret and technical communications charts and tables, and would disclose plans for the assignment of United States Government frequencies necessary to meet requirements essential to the maximum security of the United States in time of national emergency. These findings are concurred in by the Department of Defense as indicated in the affidavit attached hereto (that of Deputy Secretary of Defense, Donald A. Quarles).'
 
 
 47
 We are satisfied that the claim of privilege must be honored, particularly in the light of the provisions of Executive Order 10501.[36] Moreover, it is not essential that we examine the classified material since, for reasons previously advanced, we have concluded that the exercise of the prerogative of and by the Executive must control.[37]
 
 
 48
 Since we find no abuse by the Commission of its authority, the petition will be
 
 
 49
 Dismissed.
 
 
 
 [1]
 23 Fed.Reg. 2676 (1958)
 
 
 [2]
 Bendix under Section 5.253(d) of the Rules also filed a petition in support of proposals submitted by ARINC/ATA. Pursuant to Section 5.253(f) Bendix requested the Commission to authorize an experimental grant of limited duration to operate a collision avoidance system on 430 Mc as described in its May 9, 1958, application supra. See 47 C.F.R. 5.253(d) and (f) (1958). The Commission's denial of this separate petition under 5.253(e) is also the subject, in part, of the Bendix appeal
 
 
 [3]
 17 Pike & Fischer Radio Reg. 1588 (1958)
 
 
 [4]
 As a phase of its action the Commission amended various parts of its Rules, in particular here adding a new definition in Part 2, Subpart A of the term 'Radio-positioning' which reads:
 'The determination of position or direction by means of the constant velocity or rectilinear propagation properties of Hertzian waves for purposes other than the navigation of ships or aircraft, or other than warning of obstructions to navigation.' 47 C.F.R. 2.1 (1958).
 
 
 [5]
 Since July 1, 1958, reorganized as the Office of Civil and Defense Mobilization, pursuant to Executive Order 10773, 23 Fed.Reg. 5061 (1958), U.S.Code Congressional and Administrative News 1958, page 5567
 
 
 [6]
 18 Fed.Reg. 7049 (1953), 50 U.S.C.A. 401 note
 
 
 [7]
 47 U.S.C.A. 154(j)
 
 
 [8]
 5 U.S.C.A. 1003. Pertinent language therein reads:
 'Except to the extent that there is involved (1) any military, naval, or foreign affairs function of the United States * * *
 '(a) General notice of proposed rule making shall be published in the Federal Register * * * except * * * in any situation in which the agency for good cause finds (and incorporates the finding and a brief statement of the reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.'
 
 
 [9]
 47 C.F.R. 2.1, Subpart A (1958), defines an altimeter station thus:
 'A radio navigation mobile station, in the aeronautical radionavigation service, the emissions of which are intended to determine the altitude of the aircraft, aboard which the altimeter station is located, above the earth's surface.'
 
 
 [10]
 47 C.F.R. 2.104(a)(5) and notes, US 11, US 18, US 104. As will be seen, we believe the amendments to the Rules to have been within the scope of authority legally delegated, and the existence of facts to justify its specific exercise must be presumed, in the light of the Commission's findings. United States v. Rock Royal Co-op., 1939, 307 U.S. 533, 567, 568, 59 S.Ct. 993, 83 L.Ed. 1446; Thompson v. Consolidated Gas Utilities Corp., 1937, 300 U.S. 55, 69, 57 S.Ct. 364, 81 L.Ed. 510; Pacific States Box & Basket Co. v. White, 1935, 296 U.S. 176, 186, 56 S.Ct. 159, 80 L.Ed. 138
 
 
 [11]
 See note 4 supra
 
 
 [12]
 International Telecommunication Convention, October 2, 1947, 63 Stat. 1399, T.I.A.S. No. 1901
 
 
 [13]
 47 U.S.C.A. 305. The Commission's order denying reconsideration specifically noted that the 'allocation of these bands to the radiopositioning service has been pursuant to Presidential authority under Section 305 and not by the Commission.' Congress is quite aware of the 'dual system.' See S.Rep. No. 1854, to accompany S.J.Res. 106, 85th Cong., 2d Sess. (1958)
 
 
 [14]
 Article 22 provides: 'This convention shall abrogate and replace, in relations between the Contracting Governments, the International Telecommunication Convention of Atlantic City (1947).' (1955) 6 U.S.T. & O.I.A. 1242, T.I.A.S. No. 3266
 
 
 [15]
 Cf. Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp., 1948, 333 U.S. 103, 111, 68 S.Ct. 431, 92 L.Ed. 568
 
 
 [16]
 47 U.S.C.A. 402
 
 
 [17]
 Id. 151
 
 
 [18]
 Id. 301; and see National Broadcasting Co. v. United States, 1943, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344
 
 
 [19]
 1839, 13 Pet. 498, 38 U.S. 498, 512, 10 L.Ed. 264
 
 
 [20]
 1908, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 and see United States v. Walker River Irr. Dist., 9 Cir., 1939, 104 F.2d 334
 
 
 [21]
 18 Fed.Reg. 3513 (1953)
 EXECUTIVE ORDER 10460
 'Providing for the Performance by the Director of Defense Mobilization of Certain Functions Relating to Telecommunications
 'By virtue of the authority vested in me by the Constitution and statutes, and as President of the United States, it is hereby ordered as follows:
 'Section 1. The Director of Defense Mobilization shall assist and advise the President with respect to the following-described telecommunications functions and such other telecommunications functions as the President may designate:
 '(a) Coordinating the development of telecommunications policies and standards applying to the executive branch of the Government.
 '(b) Assuring high-standards of telecommunications management within the executive branch of the Government.
 '(c) Coordinating the development by the several agencies of the executive branch of telecommunications plans and programs designed to assure maximum security to the United States in time of national emergency with a minimum interference to continuing nongovernmental requirements.
 '(d) Assigning radio frequencies to Government agencies under the provisions of section 305 of the Communications Act of 1934, as amended (47 U.S.C. 305), and establishing policies and procedures governing such assignments and their continued use.
 '(e) Developing United States Government frequency requirements.
 'Sec. 2. The Director of Defense Mobilization shall, to the maximum extent feasible, perform his functions with the aid, or through the facilities, of appropriate departments and agencies of the Government; and he shall establish such interagency committees and working groups composed of representatives of interested departments and agencies, and consult with such departments and agencies, as may be necessary for the most effective performance of his functions.
 'Sec. 3. The Interdepartmental Radio Advisory Committee shall report to and assist the Director of Defense Mobilization in the performance of his functions as he may request.
 'Sec. 4. Nothing in this order shall be deemed to impair any existing authority or jurisdiction of the Federal Communications Commission. The Director of Defense Mobilization shall cooperate with the Federal Communications Commission on problems of mutual concern.
 'Sec. 5. The records, property, personnel, and funds used, held, employed, available, or to be made available in connection with the functions vested in the Telecommunications Advisor to the President by Executive Order No. 10297 of October 9, 1951, entitled 'Providing for a Telecommunications Advisor to the President', shall be transferred, consonant with law, to the Office of Defense Mobilization.
 'Sec. 6. The said Executive Order No. 10297 is hereby revoked.
 'Dwight D. Eisenhower
 'The White House,
 'June 16, 1953.'
 The exercise of the Director's authority under Executive Order 10460 is not here affected by Executive Order 10773, 23 Fed.Reg. 5061 (1958).
 
 
 [22]
 Federal Broadcasting System, Inc. v. F.C.C., 96 U.S.App.D.C. 260, 267, 225 F.2d 560, 567, certiorari denied WHEC, Inc. v. Federal Broadcasting System, 1955, 350 U.S. 923, 76 S.Ct. 212, 100 L.Ed. 808
 23 U.S.Const. art. II, 1 provides, in part: 'The executive Power shall be vested in a President of the United States of America.'
 
 
 [24]
 Id. 2. And compare 47 U.S.C.A. 606 which in circumstances specified, expands the President's authority to reach and control even already licensed stations and facilities
 
 
 [25]
 15 Fed.Reg. 9029 (1950)
 
 
 [26]
 Its request pursuant to the provisions of 47 C.F.R. 5,253 (1958), supra note 2, perforce was addressed to the Commission's discretion
 
 
 [27]
 Cf. United States v. Storer Broadcasting Co., 1956, 351 U.S. 192, 202-204, 76 S.Ct. 763, 100 L.Ed. 1081
 
 
 [28]
 Supra note 3
 
 
 [29]
 At the same time the Commission amended its Rules to permit non-Government licensing of dopplers on the frequency 13000 Mc
 
 
 [30]
 47 C.F.R. 2.1 (1959) defines radionavigation: 'Radiolocation intended solely for the determination of position or direction or for obstruction warning, in navigation.' The similar treaty definition was not altered by the Buenos Aires Convention, supra note 14. See 47 C.F.R. 2.601, reference T.I.A.S. No. 1901, and 47 C.F.R. 2.602, id
 
 
 [31]
 Pan American World Airways, Inc., one of the petitioners, was alleged to be at the time of the Order, the licensee of six aircraft doppler navigation stations authorized to operate on the frequency 8800 Mc. The Commission tells us in its brief that such licenses had been issued 'subject to cancellation without hearing in the event interference is caused to regularly authorized facilities, or if, in the judgment of the Commission, continued developmental operation would be, for any other reason, contrary to the public interest.' We have scoured the record but find no pleading, exhibit or testimony which discloses the terms of any such condition
 Many foreign flag air carriers were using dopplers on the 8800 Mc frequency, as the Commission was aware.
 
 
 [32]
 A pleading of record submitted by General Precision Laboratory suggests that in excess of one thousand 8800 Mc Government dopplers were available or in use
 
 
 [33]
 47 U.S.C.A. 403 in pertinent part reads:
 'The Commission shall have full authority and power at any time to institute an inquiry, on its own motion, in any case and as to any matter or thing concerning which complaint is authorized to be made, to or before the Commission by any provision of this chapter, or concerning which any question may arise under any of the provisions of this chapter, or relating to the enforcement of any of the provisions of this chapter.'
 
 
 [34]
 Act of August 23, 1958, 72 Stat. 737, 49 U.S.C.A. 1301
 
 
 [35]
 2 U.S.Code Cong. & Ad. News, 85th Cong., 2d Sess., pp. 3741-42 (1958)
 
 
 [36]
 Supra note 6
 
 
 [37]
 To what extent the authority of the President in making assignments of frequencies under 305 of the Act is to conflict with the exercise by the Commission of its authority under other sections of the Act poses another problem for Congress. It is enough for the courts that what the Commission has done is not subject to successful attack here