378 F.2d 118
 SOUTHWESTERN CABLE CO., Petitioner,
v.
UNITED STATES of America and Federal Communications
Commission, Respondents, Jack O. Gross et al.,
Intervenors.
MISSION CABLE TV, INC., Pacific Video Cable Co. and
Trans-Video Corp., Petitioners,
v.
UNITED STATES of America and Federal Communications
Commission, Respondents, Jack O. Gross et al., Intervenors.
 Nos. 21183, 21192.
 United States Court of Appeals Ninth Circuit.
 April 28, 1967.
 
 Frank U. Fletcher, Robert L. Heald, Edward F. Kenehan, Fletcher, Heald, Rowell, Kenehan & Hildreth, washington, D.C., Tuttle & Taylor, Los Angeles, Cal., for appellants Mission Cable TV, Inc., Pacific Video Cable Co. and Trans-Video Corp.
 Arthur Scheiner Gilbert B. Lessenco, Nicholas Kittrie, Washington, D.C., Richard A. Moore, Tuttle & Taylor, Los Angeles, Cal., for appellant Southwestern Cable Co.
 Henry Geller, Gen. Counsel, Daniel R. Ohlbaum, Deputy Gen. Counsel, Ruth V. Reel, Robert D. Hadl, Stuart F. Feldstein, Counsel, F.C.C., Washington, D.C., Donald R. Turner, Asst. Atty. Gen., Howard E. Shapiro, Atty., Dept. of Justice, Washington, D.C., for appellee.
 Ernest W. Jennes, Charles A. Miller, John E. Vanderstar, Covington & Burling, Washington, D.C., Miller & Spiegelman, San Francisco, Cal., for intervenors, Midwest Television, Inc. (KFMB-TV), Jack O. Gross (KJOG-TV), and San Diego Telecasters, Inc. (KAAR).
 Before BARNES and ELY, Circuit Judges, and PECKHAM,* District judge.
 BARNES, Circuit Judge:
 
 
 1
 This is a consolidation of two petitions to review and set aside portions of an order of the Federal Communications Commission (hereinafter 'FCC' or 'Commission'). Our jurisdiction rests upon 5 U.S.C. 1032 and 47 U.S.C. 405(a).
 
 
 2
 Southwestern Cable Company owns a community antenna television system (commonly designated a CATV system) in the San Diego area. Mission Cable TV, Inc. and Pacific Video Cable Company own CATV systems in the San Diego area which are operated by Trans-Video Corporation which owns all of Pacific and a majority of Mission.
 
 
 3
 CATV is a way of delivering good television reception to areas greatly removed from the originating station. The concept includes the building of a large antenna in an area where reception is good. The antenna picks up the signal of one or more stations and transmits it or them, either by wire or microwave, to the area of poor reception. In the poor reception area the signal is distributed to individual television receivers by wire, each receiver paying installation and monthly service fees. Southwestern, Mission and Pacific, petitioners here, all use cable systems rather than microwave for transmission of the signals.
 
 
 4
 San Diego is about 120 miles south of Los Angeles. San Diego is served by two VHF and one UHF television stations in San Diego and two VHF stations is nearby Tijuana, Mexico. A construction permit has been issued for another UHF station, and an application is pending for still another. For the most part, San Diego receivers cannot receive the signals of Los Angeles stations through the air. It is by CATV that many San Diegans can now watch Los Angeles programs.
 
 
 5
 The recent growth of CATV systems has come to the attention of the FCC. At first the FCC, without dissent, held it had no jurisdiction over CATV. 26 F.C.C. 403, 427-28 (1959). It next held it was authorized to deny a CATV microwave transmission license for economic reasons. Carter Mountain Transmission Corp., 32 F.C.C. 459 (1962, aff'd 116 U.S.App.D.C. 93, 321 F.2d 359 (1963)), cert. denied 375 U.S. 951, 84 S.Ct. 442, 11 L.Ed.2d 312 (1963). It then asserted jurisdiction only over CATV systems using microwave facilities to transmit their signals. See First Report and Order, 38 F.C.C. 683, 30 Fed.Reg. 6038 (1965). On April 23, 1965, the Commission released a Notice of Inquiry and Notice of proposed Rule Making (1 F.C.C.2d 453, 30 Fed.Reg. 6078 (1965)) looking toward regulation of all CATV systems. On February 15, 1966, the Commission issued a news release announcing that new rules would shortly be adopted applying to non-microwave CATV systems. These rules were adopted on March 8, 1966, and published on March 17, 1966. Second Report and Order, 2 F.C.C.2d 725, 31 Fed.Reg. 4540 (1966). The rules provided, inter alia, that (1) CATV systems must carry the signals of local and nearby stations, (2) CATV systems cannot carry on the same day a signal which deplicates a program of a local station, and (3) Commission approval is required for a CATV system to carry a signal beyond its Grade B contour. /1/
 
 
 6
 In addition to the foregoing rules, the Commission adopted Rule 74.1109 (47 C.F.R. 74.1109), which provides that on petition by a CATV system, television station or other interested person the Commission may waive any of its rules or impose additional requirements. Rule 74.1109(f) provides in part:
 
 
 7
 'In the event that an evidentiary hearing is required, the Commission will determine, on the basis of the pleadings and such other procedures as it may specify, whether temporary relief should be accorded to any party pending the hearing and the nature of any such temporary relief.'
 
 
 8
 On March 17, 1966, Midwest Television, Inc., a licensee of a San Diego VHF station (and herein an intervenor) petitioned under Rule 74.1109(f) for temporary relief pending a hearing on the effects of CATV on the television stations in San Diego. On July 25, 1966, the Commission, in the order under review here, granted Midwest the temporary relief it sought by limiting the CATV systems, petitioners here, to (1) delivering Los Angeles signals to subscribers in the area which they served on February 15, 1966; (2) adding subscribers in other areas, but to them carrying only San Diego-Tijuana signals; and (3) continuing to provide the service they had been providing prior to the date of the order.
 
 
 9
 Petitioners sought review by this court of the July 25, 1966 order, and asked for a stay of the Commission's order. After argument we issued an interlocutory injunction against enforcement of the order as it prevents the addition of new subscribers to the trunk and feeder lines in existence on August 23, 1966.
 
 
 10
 Petitioners have specified many grounds for setting aside the Commission's order, some of constitutional dimension. Initially we must consider the assertion that the Commission did not have the power to issue the order in question. We agree with the petitioners that the Commission was without power to act as it did.[2]
 
 
 11
 The order issued by the Commission was prohibitory in nature. Though petitioners contend that it was in truth a cease and desist order, the Commission has expressly denied that it is such an order and disclaimed the authority of 47 U.S.C. 312 which authorizes such orders. The Commission tells us that its only sources of authority for the order in issue are section 4(i) of the Act[3] and section 303(r) of the Act.[4]
 
 
 12
 'The Commission may perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions.' 47 U.S.C. 154(i).
 
 
 13
 '* * * The Commission * * * shall--
 
 
 14
 (r) Make such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this chapter, or any international radio or wire communications treaty or convention, or regulations annexed thereto, including any treaty or convention insofar as it relates to the use of radio, to which the United States is or may hereafter become a party.' 47 U.S.C. 303(r).
 
 
 15
 These provisions are general, couched in broad and indefinite terms.[5] There is no doubt that Congress intended by these provisions to provide the Commission with a degree of flexibility in performing its important tasks. Such provisions, however, by their own terms, are to be measured by the Act and its structure and purpose.
 
 
 16
 The method of regulation of broadcasting chosen by Congress was licensing. The Commission was created and charged with supervising the licensing function, to the end of promoting the development of the best radio (and later television) service in the public interest. To fulfill its duties the Commission was given two weapons under Section 312, revocation of the license and (since 1952) the cease and desist order. Restricting these powers, however, Congress specified certain procedural safeguards, 47 U.S.C. 312(c), (d) and (e).
 
 
 17
 We are fully aware of the authorities which have sustained grants of power to agencies and interpreted such powers so as to give those agencies a high degree of flexibility. In Clear Channel Broadcasting Service v. United States, 109 U.S.App.D.C. 88, 284 F.2d 222 (1960), the FCC's powers, specifically including section 303(r), were described as 'broad' in reference to an order regarding skywave interference. In Public Service Comm'n v. FPC, 117 U.S.App.D.C. 195, 327 F.2d 893 (1964), the District of Columbia Circuit discussed the powers of the Federal Power Commission with language which we feel is equally applicable to the authority of the FCC.
 
 
 18
 'All authority of the Commission need not be found in explicit language. * * * While the action of the Commission must conform with the terms, policies and purposes of the Act, it may use means which are not in all respects spelled out in detail.' 327 F.2d at 897.
 
 
 19
 We cannot, however, extend this language to include the power claimed by the Commission in the case at bar. We note some of the cases in which the Commission's authority has been sustained. Bendix Aviation Corp., etc. v. FCC, 106 U.S.App.D.C. 304, 272 F.2d 533 (1959), cert. denied, Aeronautical Radio, Inc. v. United States, 361 U.S. 965, 80 S.Ct. 593, 4 L.Ed.2d 545 (1960), concerned an application by Bendix for authority to use the 430 Mc radio frequency in developing an aircraft collision prevention system. Prior to the application, frequencies in the 420-450 Mc band had been reserved exclusively for government use. The court sustained denial of the application without a hearing. The denial of the authority Bendix sought, which would have been a license, was challenged procedurally in that it had been denied without a hearing. Although the court cites section 4(i) and 303(r) of the Act, both of which are set out above, there appears to have been no real challenge to the Commission's power to deny the license, so that the authority for the court's decision is that cited as section 4(j) of the Act (47 U.S.C. 154(j)), providing for procedural flexibility. Cf. FCC v. Schreiber, 381 U.S. 279, 85 S.Ct. 1459, 14 L.Ed.2d 383 (1965).
 
 
 20
 Mesa Microwave, Inc. v. FCC, 105 U.S.App.D.C. 1, 262 F.2d 723 (1958), is a case dealing with CATV problems. Mesa used microwave to carry signals and therefore needed a license. It filed an application, but no action was taken as the Commission had 'frozen' all applications pending an inquiry. The petition for a writ of mandamus was denied because the delay had not been so great (about six months) as to warrant the extraordinary remedy of mandamus. Later, in Kessler v. FCC, 117 U.S.App.D.C. 130, 326 F.2d 673 (1963), the court described the action in Mesa as declining to upset a 'freeze' on the processing of license applications. In Kessler the District of Columbia Circuit affired the 'freeze' order as it halted the acceptance of applications for certain radio licenses. The basis of the decision was that the 'freeze' order was procedural, and the later denial of the applications without a hearing was permissible. The unstated authority is probably section 4(j) of the Act, as in Bendix, supra.
 
 
 21
 The decisions examined above deal either with the licensing authority of the Commission or procedural questions related to licensing proceedings.[6] Petitioners in the case at bar point out that they have not sought a license from the Commission, nor are they required to do so.
 
 
 22
 Our resolution of the present case is guided by the language of the Supreme Court in Regents of University System of Georgia v. Carroll, 338 U.S. 586, 70 S.Ct. 370, 94 L.Ed. 363 (1950). In that case the FCC granted a license on the condition that the station repudiate its contract with certain persons, which contract, it was found by the Commission, endangered the financial ability of the station. After repudiation, a state court entered judgment for breach of contract against the station. The contention was raised that by its order the FCC had invalidated the contract. The Supreme Court noted the scope of the agency power:
 
 
 23
 'As an administrative body, the Commission must find its powers within the compass of the authority given it by Congress. * * * These cases (FCC v. Sanders Bros. Radio Station, 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940). National Broadcasting Co. v. United States, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943)) make clear that the Commission's regulatory powers center around the grant of licenses. They contain no reference to any sanctions, other than refusal or revocation of a license, that the Commission may apply to enforce its decisions.' 338 U.S. at 597-599, 70 S.Ct. at 376.
 
 
 24
 Dealing specifically with one of the provisions in issue here, to wit, the powers under Section 303(r) of the Act, the Court said:
 
 
 25
 'One suggestion is that petitioner's position has a specific statutory basis (for invalidating the contract) in 303(r), which permits the Commission to prescribe such 'conditions' as are 'necessary to carry out the provisions' of the Act. We do not think the suggestion is sound. Congress has enabled the Commission to regulate the use of broadcasting channels through a licensing power. It is in connection with this power that 303(r) is to be interpreted.' 338 U.S. at 600, 70 S.Ct. at 377.
 
 
 26
 In Carroll the Court recognized the Commission's embarrassing lack of ability to issue cease and desist orders together with its attempts to remedy the situation. The Court noted that the Commission had requested the power from Congress, 'but, so far as we are aware, the Commission request did not go beyond asking for power to issue a cease and desist order against a licensee.' 338 U.S. at 602, 70 S.Ct. at 378. The Court had reference to S. 1333, 80th Cong., 1st Sess. (1947), which was one of the predecessors to the Communications Act Amendments, 1952, 66 Stat. 711 (1952). It was the 1952 amendments which enacted the cease and desist authority of section 312 of the Act.[7] We point this out to show that in 1950, when Carroll was decided and sections 4 (i) and 303(r) were exactly as they are today, the power the Commission possessed was exercisable only against licensees or applicants. Put another way, sections 4(i) and 303(r) did not, in 1950, authorize action against a nonlicensee.
 
 
 27
 The Supreme Court again analyzed the limits of the Commission's power in FCC v. American Broadcasting Co., 347 U.S. 284, 294, 74 S.Ct. 593, 98 L.Ed. 699 (1954). In that case the Commismission had issued rules against 'giveaway' programs. The Court was concerned with the relationship between the Commission's action and the criminal sanctions against broadcasting lottery information, 18 U.S.C. 1304.
 
 
 28
 'Like the court below, we have no doubt that the Commission, concurrently with the Department of Justice, has power to enforce 1304. Indeed, the Commission would be remiss in its duties if it failed, in the exercise of its licensing authority, to aid in implementing the statute, either by general rule or by individual decisions.[7] But the Commission's power in this respect is limited by the scope of the statute. Unless the 'give-away' programs involved here are illegal under (18 U.S.C.) 1304, the Commission cannot employ the statute (the Communications Act) to make them so by agency action.' 347 U.S. at 289-290, 74 S.Ct. at 597.
 
 
 29
 The Court's footnote specifically notes sections 4(i) and 303(r). In view of the emphasized portion of American Broadcasting and the specific language of Carroll, we reach the conclusion that sections 4(i) and 303(r) are limited to the scope of the Commission's licensing authority. Cf. Head v. New Mexico Board of Examiners in Optometry, 374 U.S. 424, 433-434, 83 S.Ct. 1759, 10 L.Ed.2d 983 (1963) (Brennan, J., concurring).
 
 
 30
 The logic of our conclusion seems to us inescapable. If the authority of sections 4(i) and 303(r) were as broad and extensive as the Commission urges, the authority of section 312 to issue cease and desist orders would be meaningless or repetitive. There is nothing to indicate that if the Commission is empowered to issue an order like that under review it cannot similarly issue a cease and desist order without the safeguards of section 312. Cf. United States v. National Plastikwear Fashions, Inc., 123 F.Supp. 791 (S.D.N.Y.1954). We must assume that when Congress in 1952 gave the Commission the power to issue cease and desist orders it was not duplicating an already existing power.
 
 
 31
 Our conclusion that the Commission lacked the power to issue the order in question requires that the order be vacated and set aside. In light of our disposition of the case, we decline to express any opinion as to the other issues raised in this proceeding.
 
 
 32
 The Memorandum Opinion and Order of July 25, 1966, is vacated and set aside to the extent that it limits the operations of the petitioners as set forth in paragraphs 24-26 of that order.
 
 ELY, Circuit Judge (concurring):
 
 33
 I endorse the carefully researched opinion of my Brother BARNES, and I concur in its conclusions. I think it appropriate, however, to emphasize the basic justice of our decision.
 
 
 34
 As Judge BARNES relates, the Commission had, prior to the commencement of petitioners' activities, disavowed its power to regulate such activities.[1] It is not unreasonable to assume that the petitioners considered this history in making their determinations to embark upon their ventures. They then undertook their lawful pursuits, investing substantial sums of money and, incidentally, proceeding under the auspices of the responsible San Diego officials who issued the required municipal permits. Not until petitioners had incurred the expense of installing necessary and fixed facilities and had acquired subscribing customers did the Commission presume to issue the order which, if enforceable, would adversely affect, if not destroy, the petitioners' investments.
 
 
 35
 In the light of the only conferred powers under which its authority exists, reviewed by my Brother BARNES, and in the light of all the circumstances, some of which I have briefly stated, I believe that the Commission trespassed upon constitutional safeguards against the confiscation of property.[2]
 
 
 
 *
 Robert F. Peckham, Northern District of California, sitting by designation
 
 
 [1]
 Grade B is one of a trio of ratings according to the strength of a signal. The grades are defined in terms of the level of signal intensity which is required to provide an acceptable signal to 90% Of the locations for the following percentages of time: Principal City Grade-- 90%; Grade A-- 70%; Grade B-- 50%
 The signal of course, is strongest nearer the point of organization, and becomes progressively weaker as it is removed further from the point of origination. Intervening obstacles such as mountains or other high elevations, poor ground conductivity, or seasonal and other changes in atmospheric conditions can often impair or make impossible good television reception. That area where the signal reception is Grade B is described as being within the Grade B contour. CATV systems, of course, build their antennae in Principal City areas and then carry the signals into the Grade B contour and beyond.
 
 
 [2]
 After this case was heard, the Commission issued its Memorandum Opinion and Order, disposing of various petitions which had been filed, largely by cable-television owners and operators, seeking reconsideration of the Commission's Second Report and Order (2 F.C.C.2d 725) which had adopted rules with respect to CATV. Memorandum Opinion and Order, F.C.C.2d (released January 19, 1967). Of the seven Commissioners, one did not participate, one was absent and two dissented. See particularly the dissenting opinion of Commissioner Loevinger, wherein he states, among other things:
 '* * * It is by no means clear that there is a majority of the Commission in support of the jurisdiction that is in fact being exercised; * * *
 'If such reasons (as given in the majority opinion) are adequate to support jurisdiction, then there is no limit to the authority of this Commission.
 'I do not believe that Congress even intended to grant or will in the future ever act to grant such a vague and limitless jurisdiction as the Commission now asserts and exercises. * * * There is a strong * * * reason for insisting that the broad power of regulation should be confined within the jurisdiction specified by Congress in statutes, * * *'
 
 
 [3]
 47 U.S.C. 154(i). References to the Act of to sections are to the Communications Act of 1934, 48 Stat. 1064 (codified in scattered sections of 47 U.S.C.), unless otherwise indicated
 
 
 [4]
 47 U.S.C. 303(r)
 
 
 [5]
 We note in passing the placement of these provisions within the structure of the Act. Section 154(i) is preceded by a provision defining a quorum and authorizing judicial notice of the Commission's seal (47 U.S.C. 154(h)), and followed by one regarding the conduct of proceedings (47 U.S.C. 154(j))
 Section 303(r) is preceded by a provision authorizing the Commission to require painting or illuminating of radio towers (47 U.S.C. 303(q)), and followed by one authorizing the Commission to require all television receivers to be able to receive all frequencies.
 
 
 [6]
 The Commission's primary authority is such a case. United States v. Storer Broadcasting Co., 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956), dealt with the Commission's rule that it would not issue a license if the applicant already operated five television stations. Storer, owning five, objected that its application for a sixth was denied without a hearing
 
 
 [7]
 The direction of the Commission's powers was apparently understood by Congress to be limited to licensees when it considered the 1952 amendments to the Act. 'It is believed that the authority to issue cease and desist orders will give the Commission a means by which it can secure compliance with the law and regulations by licensees.' Conf.Rept. No. 2426, 1952 U.S.Code, Cong. & Ad.News, p. 2234
 
 
 [1]
 It had unsuccessfully sought legislation which would have specifically given it the jurisdiction which it now claims to have always had. S. 2653, 86th Cong., 1st Sess. (1960)
 
 
 [2]
 Compare California Citizens Band Association, Inc. v. United States, 375 F.2d 43 (9th Cir. 1967), wherein we very recently held that the Commission was fully empowered to adopt reasonable regulations affecting licensees whose operations clearly feel within the Commission's jurisdictional powers of supervision and regulation